13  215
44  843

## Martha C. Nichols and Isaac E. Morse *v.* Henry McCall.

Where the Sheriff's return and the deed of sale made by him to the purchaser of property at a Sheriff's sale set forth that notice of seizure was served on the parties, the burden of proof rests on the party attacking the sale, to show the falsity of such recitals, although it involves the proof of a negative.

It is not necessary in executing an order of seizure and sale that a demand of payment should be made by the Sheriff.

The Sheriff's return was in these words : "*I seized and advertised the within described property to be sold on the 15th March, 1845, but the same could not be sold, it having been stopped by plaintiff's order, and again I seized and advertised the property for the 24th June, 1845.* Held: That without other evidence it could not be inferred from those expressions that there was an actual release of the seizure, and that a sale made by the Sheriff after the return day of the writ, was valid, the original seizure remaining in force.

A change in the terms of the sale if more favorable to the seized debtor than in the first advertisement of the sale, would not invalidate it, and would be presumed to have been done at the instance of the debtor.

Parol evidence is admissible to show the acts of the party or his agent which would estop him from contesting the validity of such a sale.

APPEAL from the Third District Court of New Orleans, *Morgan*, Judge of the Second District Court, presiding. *R. Hunt* and *C. Roselius*, for plaintiffs. *Benjamin, Bradford & Finney*, for defendant and appellant.

Cole, J. This suit was instituted on the 7th April, 1855, by *Mrs. Martha C. Nichols*, widow of the late *Nathan Morse*, and *Isaac E. Morse*, to set aside a judicial sale made on the 24th June, 1845, by the Sheriff of New Orleans, under an order of seizure and sale at the suit of the Union Bank of Louisiana.

*Mrs. Martha C. Morse* having died during the pendency of the suit, the action was revived and prosecuted by *Isaac E. Morse*, her son and only heir, as the sole plaintiff upon the record.

There was judgment in the lower court and in favor of plaintiff.

The principal grounds of attacking the sale are the following :

1st.   That no notice of seizure was served upon petitioners.

The Sheriff's return and the Sheriff's deed to the original purchaser, *R. C. Cammack*, set forth, that all the legal notices were issued.   The burden of proof was upon the present plaintiffs to establish the falsity of this recital, though it involved a negative.   *Gibson* v. *Foster*, 2 A. 508 ; *Fleming* v. *Conrad*, 11 M. 301.

The correctness of the Sheriff's return has been sustained by affirmative proof, on the part of defendant, so far as it was possible under the circumstances.

*D. Augustin*, then Sheriff, states that *L. H. Sere*, the deputy who made the return, and *G. H. Tobin*, the deputy who served the notice of seizure, are both dead, but the entry in the Sheriff's book,, in the handwriting of Tobin, was offered in evidence to show that notice of seizure was served upon *Mrs. Martha C. Morse* personally on the 16th January, 1845.

· This is also corroborated by *Mr. Denis*, the attorney at that time of the Bank, who directed the Sheriff to have the notice served on her personally, as she was then in New Orleans.

As to the notice to *Isaac E. Morse*, *Mr. Cenas*, his curator *ad hoc*, states :

" In relation to notices of seizure, witness does not recollect whether he received any or not, but he was aware of the proceedings that were going on."

The Sheriff alleges all! legal notices were given, and it is incumbent on plaintiffs to prove that this return is incorrect, for all judicial proceedings are presumed to be regular until the contrary be shown.   *Hubbell* v. *Clavum*, 13 La., 496 ; *Leibem* v. *Forster*, 2 Ann., 503 ; *Gentile* v. *Foley*, 3 Ann., 146.

In the case of *Grant* v. *Walden*, *Mr. Justice Bullard* observed :

" The court is unanimous in adhering to the principle that the Sheriff's deed and return, upon the execution, are *prima facie* evidence of title in the purchaser at Sheriff's sale, and consequently that he who seeks to annul an alienation must show that the formalities required by law were not complied with."

Another objection is, " that no demand of payment was made by the Sheriff."

There is no law that requires a demand to be made.   *Ursuline Nuns* v. *Depassau*, 7 N. S., 645.

The third objection, " that the property was sold without the benefit of appraisement," is contradicted by the Record.

The other principal objection is that, " the Sheriff's pretended seizure of said property was made after the return day of said writ had expired."

There is no evidence to substantiate this objection, which is based upon the phraseology of the Sheriff's return, which says: " I seized and advertized the within described property to be sold on Saturday, 15th March, 1845, but. the same could not be sold, it having been stopped by plaintiff's order ; and again I seized and advertised the property," etc., for the 24th June, 1845.

The plaintiff's construction of the return is, that when the Sheriff was ordered to *stop the sale*, advertised for the 15th March, he released *the property from seizure*, and that before he *again seized* it, the return day of the writ had passed.

But such a construction is against the presumption that the Sheriff executed the writ according to law, and is not warranted even by the Sheriff's expressions.

The Sheriff was ordered to stop the sale for the 15th March, but it is not stated nor alleged that he was ever directed to *release the property from seizure*.

It is a forced implication from the terms, that he " again seized," that he had released the previous seizure without authority from the plaintiff and against his official duty under the writ.

If against every reasonable or legal presumption the Sheriff did in fact abandon his first seizure, it was incumbent on the plaintiff to establish the fact by proof and not by strained inferences.

Even if the Sheriff did in ignorance of his duties again seize the property, this second seizure could not affect the validity of the first, as long as he did not release the previous seizure and did not return the writ, and there is no evidence to show that he either released the first seizure or ever returned the writ.

The first seizure being legal then remained in force, and the second could not affect it, for it was useless.

The words " again I seized," seem to be an unhappy form of expression on the part of the Sheriff to show that he again proceeded to act under the seizure that he had already made. Very few Sheriffs are accurate grammarians, and it would be unwise to annul a sale on account of an inference from such an expression as this, that he had violated the law, when this conclusion is expressly contradicted by his own return, for he avers in his return that he fulfilled all the requisite formalities, and that all the legal notices were given.

The circumstance that the *sale of the property* did not take place till after the return day of the writ is not material; a legal seizure having been made, the Sheriff was warranted in retaining the writ till the sale was finally effected. *Sheldon* v. *Canal Bank*, 11 Rob. 181.

The plaintiffs cannot complain of the change of the terms of sale, because they were more favorable to them than in the first advertisement, and we may fairly presume the Bank was induced to stop the sale on the 15th March, and to readvertise the property on other terms by the acts of the plaintiffs and of their duly authorized agents.

We consider the validity of the sale to be established without any reference to the alleged ratification of the sale by plaintiffs, or to the plea of prescription of five years.

It is urged that the testimony of *H. B. Cenas* was improperly received in a proceeding which involves the title to real estate.

The power of attorney, however, under which *Mr. Cenas* was authorized to act on behalf of the plaintiff here, is in evidence, and his *acts in that capacity* are the *acts of his principals*.

He exhibited his power to the Bank. He called the attention of the Bank to the desire of the parties to have the property sold in separate lots, and on some credit, and he attended at the sale and acquiesced in the whole proceedings:

All this is matter properly proven by parol, but the effect is to estop the plaintiffs in the present suit.

It has often been held, that if a man stands by and is silent while his own property is being sold, and suffers another to become the purchaser, or if, by his acts, his conduct, or his words, he causes another to believe in a certain state of things, and induces him to act on that belief, he will be estopped by such proceedings on his part. *Marsh* v. *Smith*, 5 Rob., 518 ; *Blanchard* v. *Allain*, 5 An., 368.

It is, therefore, ordered, adjudged and decreed, that the judgment of the lower court be avoided and reversed, and it is further ordered, adjudged and decreed, that the demand of plaintiffs be rejected, and that they pay the costs of both courts.

VOORHIES, J., dissenting. I am of opinion that the judgment in this case ought to be affirmed for the reasons assigned by the Judge *a quo*, except in relation

28

MORSE
v.
MCCALL.

to the questions as to the liablity of the party for the fruits of the property, on which I express no opinion.

The writ, under which the property in controversy was sold, issued on the 14th January, 1845. The Sheriff's return shows that he received it on the same day ; and that he seized and advertised the property for sale on Saturday, the 15th March, 1845, after having complied with all the requisite formalities, and after the legal notices had been issued. But that the sale could not be effected because the same was *stopped by order of the plaintiff.* He then proceeds in his return to state (after a semi-colon) : "And again I seized and advertised the same property (of which he gives the description) to be sold on the 24th June, 1845," on conditions different from those specified in the writ, which was returned on the 18th November, 1845. There is nothing in the return from which the postponement of the sale, under the first advertisement, can possibly be deduced, nor when the seizure was effected, there being only three dates therein specified, the 14th January, the 24th June and the 18th November, 1845. The writ was made returnable on or before the second Monday of March, 1845. None of the requirements under Articles 654, 655, 667, 670 and 671 of the Code of Practice, which are essential to the validity of a judicial sale, appear from the return of the Sheriff to have been complied with. It is impossible to consider the sale as made under the first seizure, for the property was evidently not in the Sheriff's possession when he "*again seized it.*" Had it been so, his return would certainly have shown what disposition he had made of the rents of said property. C. P., 656, 657. After the return day of the writ, it is clear that no valid seizure could be made under it. It is obvious, therefore, that the sale in question, as a judicial one, must be considered as an absolute nullity. The evidence is insufficient, in my opinion, to show that it was thus made by the consent of the appellees or subsequently ratified by them.

It is, however, proper to observe, that I was absent on the trial of this cause and consequently did not have the benefit of the oral arguments of counsel. But I have carefully examined the facts and law of the case, in connection with the briefs on file, in arriving at the conclusion to which I have.

SPOFFORD, J., concurring. I concur in the decree, because the evidence satisfies me that the time and manner of the sale were acquiesced in and sanctioned by the plaintiffs, who were present through their duly authorized agent.

*C. Roselius* and *R. Hunt,* for a re-hearing, argued :

The court, in declaring the sale to the defendant valid, has substantially decided, 1st. That a sale of immovable property by a Sheriff, under an order and writ of seizure and sale, upon terms different from those contained in the order of court and prescribed by law, is a valid judicial sale : and 2d. That the terms of such a sale may be altered by the plaintiff, without the written consent of the defendant.

It is believed that both these propositions are in direct opposition to the settled jurisprudence of the State ; and the court is prayed to consider the following statement of the facts of this case, and the argument thereon.

The Bank presented its petition for an order of seizure and sale, on the 13th January, 1845. The court on the same day made the order in the following words : "Let a writ of seizure and sale issue in this case, according to law, and let *H. B. Cenas* be appointed curator *ad hoc* to represent the absent defendant, *Isaac E. Morse.*"

The writ of seizure and sale was issued on the 14th January, and made returnable on the second Monday of March, 1845. It is in the usual form, addressed to the Sheriff in the name of the State of Louisiana, and runs as follows :

"You are hereby commanded to make seizure and sale of five certain lots of ground, to wit :

" 1st. Two contiguous lots of ground, etc., measuring each 30 feet, French measure, front on Rampart st., etc.

" 2d. Three lots of ground, etc., in square No. 7, measuring each 60 feet French measure, front on Rampart street, etc., contiguous to each other, etc., together with the six one-story buildings thereon, known under the appellation of Morse's Row.

" And 525 shares of the capital stock of the Union Bank of Louisiana.

" To satisfy plaintiff's claim of the sum of $18,375, with interest at the rate of 10 per cent. a year from the 1st day of July, 1840, and on $7,875, at 10 per cent. a year from the 2d day of July, 1840, together with $7 costs of protest, $6 costs of copies and costs of suit : and in what manner you shall have executed this writ, you are further ordered to make return thereof to our parish court of the parish and city of New Orleans on the 2d Monday of March, 1845."

The duty of the Sheriff under this writ is clearly laid down in the Code of Practice, 643, 651, 654, 655, 656, 667, 670, 671 and 735, et seq ; and no principle is more firmly settled 'in our jurisprudence than that which declares, a purchaser under a sale made by virtue of such a writ, does not acquire a valid title where the formalities prescribed by law for the alienation have not been observed.

The citizen can only be deprived of his property in two ways—by his own consent, or by a forced alienation under the authority of law. The latter mode of transferring property derives all its efficacy from a strict pursuance of the formalities prescribed by law. Where then these are wanting, there is not the alienation by law, which can alone supply the want of consent by the owner.

It was the duty of the Sheriff, as soon as he received the writ of seizure, to give notice thereof to the defendants, and after the legal delay to seize the property described in the writ, and to execute the writ in the same manner and to observe the same delays and formalities as in ordinary cases under a *fi. fa.*

It was his duty then, when he seized the houses of defendants, to keep them sequestered in his custody, and to take and collect all the rents and revenues which they yielded.

It was his duty, three days after giving notice in writing to the defendants of the seizure of their property, to advertise the sale of the property seized.

It was his duty to have the property appraised, and to sell it, according to law, at public auction, to the highest bidder, for cash, provided the price offered reached two-thirds of the appraisement. and if not, to postpone the adjudication, and after a " fresh notice of the time and place of sale," etc., to sell the property at twelve months credit.

Did the Sheriff perform his duty and comply with the formalities prescribed by law for the sale of the property ? His return furnishes an answer to the question. The return is in these words :

" Received 14th January, 1845, and after having fulfilled all the requisite formalities, and all the legal notices having been issued, I seized and advertised the within described property to be sold at the City Exchange, St. Louis street, between Chartres and Royal streets. in this city, on Saturday, the 15th of March, 1845, but the same could not be sold, it having been stopped by plaintiff's order.

" And again I seized and advertised the same property *divided* as follows, to wit : "

[*Here follows the description of the property as divided into seven lots, with a number of shares of bank stock on each lot.*]

" To be sold at the City Exchange, St. Louis street, between Chartres and Royal streets, in this city, on Tuesday, 24th June, 1845, at 12 o'clock, M., when *Alfred Mercier* being the last and highest bidder for the lot *firstly* described, said lot was adjudicated to the said *Alfred Mercier* for the price of $10,000. ·

" Lots 2d, 3d, 4th and 5th described, to *George Morgan* for the price of, as follows :

" Lot *secondly* described, for $4,900 ; Lot *thirdly* described, for $3,600 ; Lot *fourthly* described, for $3,400 ; and Lot *fifthly* described, for $3,400 ; Lot *sixthly* described to *C. M. Jones* for $3,350 ; Lot *seventhly* described, to *R. C. Cammack,* for $3,325, payable as follows, viz : The purchaser of Lot No. 1, to assume the mortgage to secure 180 shares of the Union Bank stock, and the loan thereon of $3,600, due 1st Nov. 1845, and renewable on the terms and conditions of the charter of said bank. The purchaser of lot No. 2 to assume the mortgage to secure 65 shares of said stock, and the loan thereon of $1,300, due and renewable as aforesaid.

"The purchaser of lots Nos. 3, 4, 5, 6 and 7 to assume on each lot the mortgage to secure 56 shares of stock, and the loan thereon of $1,120, due and renewable as aforesaid.

"The balance of the purchase money payable one-fifth cash and balance at 6, 12, 18 and 24 months, for notes bearing interest at the rate of 7 per cent. per annum from the date of sale until paid, satisfactorily endorsed and secured by mortgages on the property sold ; which I hereby acknowledge to have received as follows, viz : according to the above conditions.

Returned 18th Nov. 1845.         [Signed]         L. H. SERE,
                                                          Deputy Sheriff."

It will be observed that this return consists of two parts.

The first part contains the return of the Sheriff's proceedings under the writ in relation to his seizure and advertisement of the property to be sold on Saturday, 15th March, 1845. It sets forth that all the requisite formalities were fulfilled, and all the legal notices were issued, but the property could not be sold, the sale having been stopped by plaintiff : and there the first part of the return ends. It calls for no comment at present.

The second part of the return contains the Sheriff's proceedings in relation to the seizure and advertisement of the property for sale on Tuesday, 24th June, 1845, and to the pretended sale of the property under the writ. It is the basis of the title set up by the defendant, and must therefore be carefully examined.

The Sheriff commenced the second part of his return as follows : "And again I seized and advertised the same property," etc. The word "again" means "a second time ; once more." Webster's Dictionary. This is the sense in which the word is used, not only by accurate grammarians, men versed in grammar and the construction of languages, and learned phiologists ; but by all classes of persons, in common conversation, and in the every day business of life. This, too, is evidently the sense in which the Sheriff used the term in his return. He said, and he meant to say, that he seized the property a second time, and advertised it a second time. It is respectfully submitted to the court, that no rule of construction, whether literal, strict and grammatical, or rational, enlarged and liberal, can impart any other signification to the Sheriff's language. That language has but one meaning, and common sense, custom, law, grammar, unite in fixing it. It has no need of interpretation, and for that reason does not admit of it. The plaintiff, therefore, earnestly submits that this court has erred in the conclusion to which it arrived, and which it has expressed in these words : "The words 'again I seized,' seem to be an unhappy form of expression on the part of the Sheriff to show that he again proceeded to act under the seizure that he had already made. Very few Sheriffs are accurate grammarians." The court cannot thus construe the words out of the return. The words "again I seized," are in the return and must have their usual meaning and effect.

The language of the second part of the return is in strict conformity with the rules of grammar ; but if the language were inaccurate, that inaccuracy would not be allowed to nullify and render void the clear statement of a fact by a sworn officer of the law.

Now, if it be admitted that the Sheriff's statement is true, and that he did seize the property a second time, the question arises, why did he a second time seize and advertise the property for sale ? The answer is obvious. Under the first seizure, the property was advertised to be sold on Saturday, March 15th, 1845, but the same could not be sold, the sale having been stopped by plaintiff's orders : the property must, at that time or soon after, have been released from seizure by the Sheriff ; and consequantly a second seizure became necessary to enable him to advertise and sell the property. If this natural and obvious conclusion is adopted, the official declaration of the Sheriff "again I seized," is clear and has effect ; but if this conclusion is rejected, then the official declaration of the Sheriff must be stricken out of his return, and it must be inferred that the Sheriff who had seized, and still held possession of the property under the writ, made a second seizure of the same property in his own hands, at the suit of the same parties, and under the same writ by which he then held it. It is not to be presumed that the Sheriff did a useless or absurd thing ; nor can such a construction be put upon his language as will render it a nullity or quite elude its force. And yet this is precisely the construction which the court has placed upon the words "again I seized," etc.

In coming to this conclusion the court has literally adopted the defendant's argument, at page 13 of his printed brief, and joined in declaring : "If, against

every reasonable or legal presumption, the Sheriff did in fact abandon his first seizure, it was incumbent on the plaintiff to establish the fact by proof and not by strained inferences." The court then adds to the defendant's argument the following: "Even if the Sheriff did, in ignorance of his duties, again seize the property, this second seizure could not affect the validity of the first, as long as he did not release the previous seizure, and did not return the writ, and there is no evidence to show that he either released the first seizure or *ever* returned the writ. The first seizure being legal, then remained in force, and the second could not affect it, for it was useless."

There is no dispute as to the return of the writ. The date of the return is fixed by the Sheriff as follows, viz : "Returned 18th November, 1845." As for the assertion that the property was not released, but remained under the first seizure in the Sheriff's hands and was sold under that seizure; it has already been shown from the Sheriff's statement, that it is impossible to consider the sale as made under the first seizure ; "for," in the language of Judge *Voorhies*, "the property was evidently not in the Sheriff's possession, when he again seized it."

But apart from what has been said, the record contains conclusive evidence that the Sheriff did not retain possession of the property under the first seizure until the sale. The writ was issued January 14th, 1845 ; the property was seized and advertised "to be sold on the 10th March, 1845," but the sale was stopped by plaintiff. The property was again seized and advertised to be sold on the 24th June, 1845. The evidence shows that the six houses in Morse's Row were rented at $40 each, per month, and the other house at $100 a month, making together $340 a month. If the property remained in the Sheriff's hands under seizure from January, 1845, until it was sold, then, as by Art. 656 of the Code of Practice, "when the Sheriff seizes houses or lands, he must take at the same time all the rents, issues and revenue which this property may yield," his return would show what disposition he made of the rents of the property for the months of January, February, March, April, May and June. For, rents received by the Sheriff from property under seizure in his hands, are moneys which he is bound to credit on the execution. But the Sheriff's return is silent on the subject of the rents, and thus bears evidence that he did not collect the rents, and did not retain possession of the property during those months.

Now, if it be true that the property did not remain in possession of the Sheriff under his seizure in January, until the sale on the 24th June, 1845, but was seized a second time by the Sheriff, the evidence establishes beyond a doubt, that the second seizure was made after the expiration of the writ, and was therefore illegal. The record shows that the "counsel for defendant offered in evidence the appraisement made on the 13th March," for the sale advertised for the 15th. The plaintiff therefore must have directed the Sheriff to stop the sale sometime subsequent to the 13th March, the date of the appraisement. But the return day of the writ was 10th March, 1845. The sale of the property must then have been stopped, and the property itself must have been released from the first seizure, after the expiration of the writ ; and the second seizure of the property was without warrant of law, and consequently the pretended judicial sale under the writ was a nullity.

The second part of the Sheriff's return proceeded as follows :

"And again I seized and advertised the same property, *divided* as follows, to wit :

"I. One lot of ground and brick dwelling house, measuring, etc., front on Rampart street, between Canal and Customhouse, with 180 shares of the capital stock of the Union Bank.

"II. One lot and brick dwelling, corner of Rampart, Canal and Basin streets, measuring, etc., with 65 shares of the capital stock of the Union Bank.

"III. One lot and brick dwelling house adjoining lot No. 5, and measuring, etc., together with 56 shares of the capital stock of the Union Bank.

"IV. One lot and brick dwelling adjoining lot No. 3, etc., together with 56 shares of the capital stock of the Union Bank.

"V. One lot and brick dwelling, adjoining lot No. 4, etc., together with 56 shares of the stock of the Union Bank.

"VI. One lot and dwelling adjoining lot No. 5, etc., together with 56 shares of the capital stock of the Union Bank.

"VII. One lot and brick dwelling house adjoining lot No. 6, etc., with 56 shares of the capital stock of the Union Bank.

"To be sold, etc., on 25th June, 1845, when," etc., the property was sold on the

Morse
v.
McCall.

conditions and in the manner set forth in the portion of the return already printed in this application for a re-hearing.

The division of the property and the conditions of the sale were entirely different from those specified in the writ. The mandate of the court was disregarded. Property ordered to be sold in block was advertised for sale in separate and distinct portions ; and these portions were severally adjudicated to the highest bidders. The terms of sale were at the same time changed. Instead of paying cash, the purchasers were to be allowed to assume respectively mortgages to secure certain shares of bank stock and the loan thereon, due 1st November, 1845, and renewable on the conditions of the charter of the bank, the balance of the purchase money payable one-fifth cash, and the balance at 7, 12, 18 and 24 months, bearing interest, etc. It is manifest, then, that the sale was not made in conformity with the order of the court, and is, therefore, not a judicial sale. The purchasers must have perceived, on a mere inspection of the proceedings, that the sale was made by the Sheriff on terms different from those ordered by the judge, and prescribed by law for forced sales, and that, therefore, the titles offered them were not derived from justice, through its officers pursuing the strict forms of law.

The writ was the warrant or authority of the Sheriff, who was bound, in executing it, to conform, in all his proceedings, to the requisites of the law. In making the seizure, in giving notice to the parties, in advertising the property, in the appraisement and in the sale of it, he was bound to observe and comply with the formalities and provisions of law. A seizure of property may be legally made, notices may be regularly issued and served, an appraisement may be formally made, and yet, if the Sheriff advertise and sell the property in a manner and on terms different from those prescribed by law for judicial sales, the whole proceeding loses its judicial character. *The Union Bank* v. *Bradford,* 2 An. 416. *Moore* v. *Hampden,* 3 An. 195.

" A forced alienation results from a sale made at the time and in the manner prescribed by law, etc.; if a sale be made where these requirements are wanting, the purchaser does not acquire the right, and interest which the debtor had in the thing sold." *Dufour* v. *Camfranc,* 11 M. 610, 675. " One claiming title under a forced sale of property must show that *all* the requisites of the law have been strictly and faithfully complied with, otherwise the sale shall be annulled. 1 *Hen. Dig.* 651, Nos. 2 and 3, citing 7 N. S. 185 ; 8 N. S. 246 ; 3 La. 421 ; 4 La. 140, 207 ; 9 La. 542 ; 2 An. 846.

Courts are not at liberty to pronounce any formality required by law, unnecessary ; or to enquire whether a change in the manner and terms of sale, from those ordered by the court, and prescribed by law, to others entirely different and substituted by the seizing creditor, were more favorable to the complaining debtor whose property has been sold. The change itself at once destroys the judicial character of the sale : and in this sense the plaintiff submits that the following proposition, laid down by the court, is not law, viz : " The plaintiff cannot complain of the change of the terms, because they were more favorable to him than in the first advertisement.

The plaintiff may, perhaps, hereafter show that these terms were, under the circumstances of the case, peculiarly harsh and oppressive ; but the question now is, were they legal or illegal ? In other words, is that a judicial sale, which is not made in conformity to the order of the court, and to the requisites of the law ?

The plaintiff forbears to press this point any further ; but as the opinion of the majority of the court seems to rest upon it, and as the plaintiff believes the sale on which the defendant relies cannot be deemed a judicial sale, without controvening the well established principles of law in relation to forced sales, he again earnestly and respectfully prays the court to reconsider the point.

If the argument just urged is correct, the sale under which defendants claim title, was not a judicial sale. The question then arises, was it a sale made with the consent of the defendants in the executory proceedings ?

Now, if the purchaser at that sale derived his title from the consent of the owners that the Sheriff should sell on terms which they prescribed, the sale being a public sale, remained subject to the rules of sales of real property. *Moore* v. *Hampton,* 3 An. 195 ; and the consent must have been in writing. The jurisprudence of the State is settled on this point.

In *Bonner* v. *Baker,* the plaintiff introduced the testimony of *Mr. Kinney* to prove that the defendant was present at the public sale of the property to the plaintiff and made no objections. This court said : " *The testimony of Mr. Kin-*

*ney we consider immaterial.* He says he was at the Arcade when the property described in plaintiff's petition was offered for sale and adjudicated to plaintiff. *Defendant was also present and made no objections.*"

" In relation to auction sales of immovables and slaves, the law requires that the authority given by the vendor to the auctioneer should be in writing, as well as the condition on which sales are made. C. C., Art. 25, 84. No such authority appears to have been given in this case. In the case of ' *Pew* v. *Livaudais*, 3 La., 460, the court held' : We have no hesitation to say, that as another part of the Code, Articles 2255-6, requires the assent of the parties to a sale of real estate to be written, unless the party against whom the sale is sought to be enforced, admits it; we cannot recognize any validity in an auction sale of real property, the owner of which did not authorize or assent to in writing, and does not admit his assent otherwise."

" The same principle is also recognized in the case of *Short* v. *Knight*, 15 La., 484. In that, the adjudication was held to be null and void, on the ground of the absence of written evidence of any authority given by the defendant to the auctioneer to sell the lot." 8 An. 284.

In the present case there is not only a total absence of any written evidence of the plaintiff's consent to the conditions on which the property was sold, but the proof is clear that the change in the terms of sale was never·made known to the plaintiffs. How then can it be argued that the plaintiffs gave a legal consent to the sale and to the conditions on which it was made?

The court says : " The power under which *Mr. Cenas* was authorized to act on behalf of the plaintiff here, is in evidence, and his acts in that capacity are the acts of his principals." To determine whether the acts of an agent are binding upon his principal, it is necessary to determine first the legality of the acts and the extent of the authority of the agent. A principal cannot authorize his agent to do anything contrary to law or public policy. A principal cannot confer upon his agent power to do that which the principal himself has no legal power to do. The law will not allow any such authority or power, and therefore the act would be void. If then a change in the manner and terms of a public sale of immovable property by the Sheriff, cannot be made by the owners of the property without a written consent to a change, and to the conditions on which the sale is to be made, it necessarily follows that the owners cannot confer upon their agent authority to make such a charge otherwise than in writing ; and, therefore, the plaintiffs here could not delegate authority to *Mr. Cenas* to change the terms of sale of their property by the Sheriff in any other way than in writing. But *Mr. Cenas*, who was introduced by the defendant to prove his consent as agent to the change in the conditions of the sale under consideration, testified clearly and positively that he did not give any written consent to the change. In his direct examination, after stat· ing that when he was informed " that the property had been seized, he applied to the bank to have the terms of sale changed if possible ;" his testimony continues as follows :

" Witness had several conversations with *Mr. Frey*, the cashier, and *Mr. Adams*, who was then either the president or one of the principal directors ; and whether, through the representations of witness or some other cause, the sale, as first advertised, did not take place and more favorable terms were afterwards granted by the bank, upon which the property was sold. The terms to which witness refers are those as stated in the advertisement for the sale on the 24th June, 1845."

" This statement appeared to the plaintiffs to be somewhat vague. It was, therefore, deemed necessary on the cross-examination to press *Mr. Cenas* upon the point of the agreement which the defendant pretended had been made concerning the change of the conditions of the sale. Being thus pressed, he testified : " It is not to witness' knowledge that the conversation had between him and *Messrs. Frey* and *Adams*, were reduced to writing."

" He does not know whether the terms of sale were altered by the bank for the purpose of saving themselves, or through the solicitation of witness."

" There never was any positive agreement between witness as curator *ad hoc*, or as agent, and the President and Cashier of the bank, as to the terms upon which the property was to be sold."

" There never was any categorical agreement, either *verbal* or *written*, between the bank and witness, fixing the terms of sale."

The examination in chief was then resumed by defendant, and *Mr. Cenas* said as follows, viz :

" Witness was aware that the terms of the new advertisement were to be made more easy, but he did not know the exact terms until he saw the advertisement."

This testimony establishes the fact that the property was sold by the Sheriff upon terms dictated by the bank, without the consent written or verbal of the defendants in execution or of their alleged agent, in violation of law and of the order of court.

His Honor, Judge Spofford, in giving his assent to the decree of this court, said : " I concur in the decree because the evidence satisfies me that the time and manner of the sale were acquiesced in and sanctioned by the plaintiffs who were present through their duly authorized agent." This language is quite guarded. It conveys the idea, not that the plaintiffs gave any positive assent to the altered terms of sale, but, that they submitted to them without opposition on the part of their agent who was present, and that they (thus ?) sanctioned them. The Judge does not detail what part of the evidence satisfied him that the time and manner of the sale were " sanctioned by the plaintiffs who were *present* through their duly authorized agent." But the ground of his concurrence is perhaps more fully stated in the subjoined extract from the opinion of the majority of the court, who have adopted it literally from defendants brief :

" The power of attorney under which *Mr. Cenas* was authorized to act on behalf of the plaintiff here, is in evidence, and his *acts in that capacity* are the *acts of his principals.* He exhibited his power to the bank. He called the attention of the bank to the desire of the parties to have the property sold in separate lots, and on some credit, *and he attended at the sale,* and acquiesced in the whole proceedings. The effect of this is to estop the plaintiffs in the present suit. It has been repeatedly held that *if a man stands by and is silent* while his own property is being sold, and suffers another to become the purchaser, or if, by his acts, his conduct or his words, he causes another to believe in a certain state of things, and induces him to act on that belief, he will be estopped by such proceedings on his part. *Marsh* v. *Smith,* 5 Rob., 218 ; *Blanchard* v. *Allain,* 5 An. 368."

The plaintiff feels constrained here again earnestly to entreat the court to re-examine this position. A brief reference to the evidence connected with it is deemed important.

On the 8th of May, 1844, the plaintiff, *I. E. Morse,* wrote a letter to the Union Bank, stating that he had just received a communication from the attorney of the bank, informing him that two of his (*Morse's*) bonds had been placed in the attorney's hands for suit ; that he, *Morse,* had been only waiting for a favorable moment to offer all his property (for sale) to pay off the debt due the bank ; that *in the fall of the year* when the bank paid off one-quarter of its capital, the mortgaged property and bank stock would bring a better price ; that the property might then be sold on a credit, but if the Directors thought a forced sale for cash necessary, he trusted that the bank would sell the lots on Circus street separately and bid a fair price for the property, which would bring enough to pay off all the bank debt, and leave a surplus ; and he concludes thus : " the only favor then that I ask is, if it be possible to get along without sacrificing this property until after the payment of the bonds in November (which I trust will save the credit of your institution), and that then the property, stock, &c., *shall be sold for cash,* if you think best, or if you do not want the money immediately, for such credit as you may consent to."

The bank never answered this letter, but it refrained from seizing and selling the property in May, 1844.

About six months after this, the plaintiff came to New Orleans on his way to attend the meeting of Congress, in Washington. While in New Orleans, he gave the following power of attorney to *Mr. H. B. Cenas :*

" New Orleans, Nov. 14th, 1844.

" We, the undersigned, do hereby nominate and appoint our friend, *Hilary B. Cenas,* of the city of New Orleans, to be our lawful agent and attorney in fact, to represent us and act for us in all matters in relation to the sale of all real estate, bank stock, to sign and make notes, receipts, to compromise, sell, and empowering him to use our names jointly and severally and *in solido,* to bind us in any manner that we can bind ourselves, hereby ratifying and confirming all his acts and signatures to have the same force and effects as if the same had been done by ourselves.

(Signed)              Martha C. Morse,
                      Isaac E. Morse,
Sole heirs and executors of the estate of *N. Morse,* deceased.

The defendant examined *Mr. Cenas*, as a witness, in explanation of the plaintiffs' motives in executing the power of attorney.

He states, that "*Mr. Morse*, previous to his departure for Washington City, handed to witness the power of attorney herein filed, and told witness that he had been endeavoring to effect a settlement with the Union Bank of his and his mother's indebtedness to said bank—that this debt was secured by mortgage upon his property on Rampart street, and that he was anxious to have the property sold or disposed of to pay the debts, and that he had actually offered the property, as witness understood him, to the bank in payment of the debts, and had been in treaty with the bank to that effect. That something would have to be done very soon, as the bank was pressing for a settlement, and that he thought it best to leave this power of attorney to sell the property in case the bank should consent to *a private sale*. At any rate, that witness was to confer with the bank, and do the best that he could.

"Witness was under the impression at the time, from the conversation which he had with *Mr. Morse*, that the property had to be sold that winter, and that if not sold as he desired, the bank would proceed to sell under its mortgages. Informed the bank through *Mr. Frey*, the Cashier, that he held the power of attorney and was ready to do all he could to subserve the interest of *Mr. Morse* and his mother in the matter."

It appears that *Mr. Cenas* did not effect a private sale of the property:—on the 14th of January, 1845, the bank sued out a writ of scizure and sale, to have the houses and lots and the stock of the present plaintiffs sold in block, had a curator *ad hoc* appointed to represent *I. E. Morse*, who was in Washington, attending to public business, and advertised the property for sale; when the proceedings were had which have been already examined. To complete the history of these proceedings, it is necessary to add the following resolution, by which the property was sold by the Sheriff, at public auction, on the 24th of June, 1845, in midsummer, when comparatively few capitalists are in New Orleans:

"NEW ORLEANS, 25th April, 1845.

"The Board, on motion, consented to have the property of the estate of *N. Morse*, mortgaged to the bank for the Stock and Loan, sold in lots, as specified in the resolution of 7th of March last, and on the following terms, viz: The purchaser to be entitled to a loan of $20 per share on the stock, payable according to the the terms of the charter, and the balance of the purchase money payable one-fifth cash and the remainder in notes at 6, 12, 18 and 24 months, bearing seven per cent. interest per annum, satisfactorily endorsed and secured by mortgage on the property."

It is apparent from *Mr. Cenas*' testimony, that the power of attorney given to him by the plaintiffs, was with a view to enable him to effect a private sale of the property, in case the bank should consent to such a sale.

It is certain that the power of attorney, however general in its terms authorizing *Mr. Cenas* "to represent the plaintiffs, and to act for them in relation to the sale of real estate," and "*to bind them in any manner that they could bind themselves*," did not and could not confer upon him any power which they themselves did not possess, and consequently could not authorize him to consent to a change in the conditions of a public sale of their real property, *without expressing that consent in writing.* "A contrary doctrine would," according to the opinion pronounced by Judge Martin in 3 La. 460, "deprive all the real property in this State of the protection which the Code provides for it, against perjury, forgetfulness or error."

It is equally certain that the power of attorney did not authorize *Mr. Cenas* to represent the plaintiffs in a suit against them and that his appointment as curator *ad hoc* to represent *Mr. Morse*, who was absent from the State, did not empower *Mr. Cenas* to waive any formality prescribed by law, or to change the terms of sale fixed by the order of the court.

It is unnecessary to inquire, whether in accepting the appointment of curator *ad hoc*, *Mr. Cenas* virtually resigned his agency under the power of attorney, and could thenceforth act only as a curator *ad hoc*, in relation to the Sheriff's sale; for, if it be conceded that he exercised at once the authority of a curator *ad hoc* under the appointment of the court, and the authority of an agent under the appointment of the plaintiffs, still this combined authority did not legalize the terms of sale upon which the Sheriff adjudicated the property. It has indeed been seen that *Mr. Cenas* expressly testified that he never gave any consent, written or ver-

bal, to the change in the terms of sale; and further, that he never saw or knew the change until it had been actually made and advertised by the bank.

The plaintiffs admit freely the correctness of the following statement of the court: "It has been repeatedly held, that if a man stands by and is silent while his own property is being sold, and suffers another to become the purchaser, or if, by his acts, his conduct or his words, he causes another to believe in a certain state of things, and induces him to act on that belief, he will be estopped by such proceedings on his part."

They admit also the correctness of the decisions in 5 Rob., 518, and in 5 An. 368, referred to by the court. In the case cited from 5 Rob., 518, the defendant purchased a tract of land by the advice and assistance of the plaintiff himself, who was at the time owner of the same titles under which he claimed the land in the case, but concealed their existence from the defendant. In the case cited from 5 An., 368, certain real property inventoried and appraised as belonging to the succession of *Isidore Blanchard*, was under the advice of a family meeting sold; and the *proces-verbal* thereof described and adjudicated the land as it was inventoried. *Victor Blanchard* signed the inventory and the proceedings of the family meeting; was present at the judicial sale, and was a party to the *proces-verbal* of adjudication without any explanation. *That* formed against him a *presumptio juris et de jure* of the truth of the enunciation that the property belonged to the succession of *Isidore Blanchard*. *Victor Blanchard* died; and his heirs instituted suit to recover the property from the purchaser. And the court held that the heirs were estopped from asserting title.

But the plaintiffs respectfully submit that neither the decisions which have just been examined, nor the principle which they have been cited to support, can be properly applied to the case now under consideration: a case of seizure and sale of the real estate of absent persons on different terms from those fixed by the order of court and prescribed by law; on terms dictated by the plaintiff in execution, without the consent, verbal or written, of the defendants or their agent, in violation of the policy of the law. *Bonner* v. *Baker*, 8 An. 284; *Pew* v. *Livaudais*, 3 La. 461; C. C. Arts. 2584, 2255–6.

Nor can the fact that *Mr. Cenas attended the sale and made no objections to it*, estop the plaintiffs here. If the decision of *Bonner* v. *Baker*, made in May, '53, is to be respected, the mere presence of the plaintiffs themselves at the sale of their real property, would not have been an estoppel to the present suit. *A fortiori*, the attendance of *Mr. Cenas* at the sale cannot estop the plaintiffs from setting up their title now. If, on the other hand, that which was decided to be law in 1853, is to be overturned and disregarded now, and the presence of the plaintiffs at the sale of their real estate by the Sheriff under the circumstances of the case, would have estopped them, as the majority of the court in the opinion under examination, intimate it would have done, yet, as in point of fact, the plaintiffs were not personally present at the sale, the question arises, whether the mere presence of their agent at the sale, can estop them? And this question must be answered in the negative.

The power of attorney to *Mr. Cenas*, was a power "*to represent* the plaintiffs *and act for* them in all matters in relation to the sale of all real estate, bank stock; to sign and make notes, receipts; to compromise, sell; and empowering him to use their names jointly and severally, and *in solido* to bind them in any manner that they can bind themselves." Surely the court will not hold that this power of attorney conferred upon *Mr. Cenas* authority to bind his principals in any other manner than by writing, in relation to the sale of real estate.

Where a man unintentionally produces a false impression in order to mislead another or to obtain an undue advantage of him, there is a positive fraud, in the truest sense of the terms. There is an evil act with an evil intent; *dolum malum ad circumveniendum*.

It makes no difference whether the fraud was perpetrated by the party directly interested or by an agent, *if the fraud be adopted by the principal*. But where the alleged fraud by a vendor of real estate consisted in a fraudulent concealment of a right of way over the premises, proof of concealment by vendor's agent has been held insufficient to set aside the purchase; there must be proof of direct personal knowledge and concealment by the principal himself. And knowledge acquired by an agent, otherwise than as an agent for such sale, of a fact, the non-communication of which is made the ground of relief against the purchaser, does not affect the contract. 1 Story's Equity; *Wilde* v. *Gibson*, 1 House of Lords' cases, 605.

These principles apply to the case of a man whose property is sold while he stands by and is silent.

"In order, however, to justify the application of this cogent moral rule, it is indispensable that the party so standing by and concealing his rights, should be fully apprised of them, and should by his conduct or gross negligence influence the purchase; for if he is ignorant of his rights, or if his acts· or silence do not mislead or in any manner affect the transaction, there can be no just inference of actual or constructive fraud. For a right can be lost or forfeited only by such conduct as would make it fraudulent and against conscience to assert it. 1 Story's Equity, § 387.

Re-hearing refused.